**In re VICTORIA L.**

**No. 2006–85–Appeal.**

Supreme Court of Rhode Island.

July 10, 2008.

Martha Kelly, Frank Iacono, for Plaintiffs DCYF, CASA.

Paula Rosin, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on April 7, 2008, on appeal by the respondent, Rosalia Lopez–Navor (Lopez–Navor or respondent), from a decree entered in the Family Court terminating her parental rights to her daughter, Victoria L., who was born on June 16, 2004. For the reasons set forth in this opinion, we affirm the judgment.

## Facts and Travel

This appeal is the first in a trilogy of cases arising from the horrific abuse that was inflicted upon Victoria's brother by their father, compounded by Lopez–Navor's utter failure to protect the child. The respondent, a native of Mexico, met Raul DeRosas (Raul)[1] when she was fifteen years old and he was twenty-two. In January 2001, Raul came to the United States, leaving a pregnant Lopez–Navor in Mexico. On August 17, 2001, their son, Alexis L.,[2] was born in Mexico. Two years later, in August 2003, Raul sent for Lopez–Navor, who then was eighteen years old. She illegally entered the United States and arrived with Alexis in Providence, where she was reunited with Raul. Lopez–Navor testified that she came to the United States because she "had many illusions of having [her] own family and being with the [father] of [her] child."

The reunion soon resulted in a second pregnancy. The record discloses that Lopez–Navor was about ten weeks pregnant on October 30, 2003, when she was hospitalized for a kidney infection. While Raul and Alexis were visiting Lopez–Navor at the hospital, a certified nurse's assistant observed bruising on Alexis's face and reported it to a staff social worker. Raul and Lopez–Navor claimed that Alexis had suffered the injuries by falling. Subsequent examination at Hasbro Children's Hospital revealed bruises and a slap mark on his left cheek, bruising of his gums, cuts to the inner lips, a laceration behind his right ear, bruises and bite marks on his buttocks and upper thighs, lacerations on both ankles, and a laceration of his penis. The Department of Children, Youth and

1. On September 28, 2005, a decree was entered in the Family Court, finding that Raul DeRosas was unfit because he had abandoned or deserted the child, and determining that his parental rights should be terminated.

2. In the record on appeal, the child is referred to as Alexis as well as Yahir Alejandro. We shall refer to him as Alexis.

Families (DCYF) was contacted, and Alexis was admitted to the hospital for further evaluation. He soon was placed in DCYF"s temporary custody.

Although Raul and Lopez–Navor initially denied physically abusing Alexis, Raul later admitted to spanking him several times on the buttocks when Lopez–Navor was present. Subsequently, Lopez–Navor confirmed that she saw Raul spank Alexis on one occasion. DCYF opened an abuse case, and Raul and Lopez–Navor were indicated[3] for physical abuse against their son. Raul subsequently was charged with second-degree child abuse under G.L.1956 § 11–9–5.3, and Lopez–Navor was charged with cruelty to or neglect of the child under § 11–9–5, for failing to protect him.

The DCYF investigation also disclosed that Raul and Lopez–Navor were in the United States illegally; the United States Department of Immigration and Naturalization Service placed a "hold" on both of them. Raul was detained and then deported to Mexico on February 12, 2004. A pregnant Lopez–Navor was detained briefly and released on personal recognizance on December 23, 2003. She was required to present herself to the Immigration and Naturalization Service once a month. By April 2004, Lopez–Navor was living at the Women's Center shelter with the assistance of the Mexican Consulate, which is located in Boston, Massachusetts. In May, Lopez–Navor's mother, Epigmenia Lopez (Epigmenia), arrived in the United States to assist her daughter.

When Victoria was born on June 16, 2004, DCYF was notified and placed the newborn in temporary protective custody.

On June 18, 2004, DCYF filed a child-neglect petition, alleging that the parents had failed to provide Victoria with a minimum degree of care, supervision, or guardianship; that Victoria was without proper parental care and supervision; and that the father had abandoned and/or deserted Victoria.

On September 29, 2004, DCYF developed a case plan that designated reunification as the goal and provided for supervised visits between Victoria and Lopez–Navor. However, DCYF could not provide any other services to Lopez–Navor because, according to DCYF social caseworker Rita Graterol (Graterol), "[t]here were no places available for Spanish-speaking parents to attend a class of parenting classes in Spanish." Soon thereafter, on October 22, 2004, a Family Court justice entered a decree terminating Lopez–Navor's parental rights to Alexis.[4] A month later, on November 22, 2004, DCYF filed a petition to terminate Raul and Lopez–Navor's parental rights to Victoria based on multiple allegations: (1) abandonment of the child by the father; (2) unfitness of the parents by reason of conduct or conditions seriously detrimental to the child, placement with DCYF, involuntary termination of parental rights to another child, the continued lack of ability or willingness to respond to rehabilitative services, and the improbability that further time would result in reunification within a reasonable period; and (3) unfitness based on committing, or allowing to be committed, conduct toward any child of a cruel or abusive nature.

---

3. "Child Protective Investigators 'indicate' a case if, upon completion of an investigation, a preponderance of the evidence demonstrates to them that a child has been abused or neglected." *In re Brooklyn M.*, 933 A.2d 1113, 1115 n. 1 (R.I.2007).

4. Rosalia Lopez–Navor's appeal with regard to Alexis is pending and docketed separately as No.2006–57–Appeal.

Meanwhile, on March 16, 2005, while this termination petition was pending, a jury found Lopez–Navor guilty on the felony charge of cruelty to or neglect of Alexis. She was sentenced to eighteen months probation and referred to counseling. This Court today has affirmed that conviction.

A Family Court trial on the termination petition commenced on April 25, 2005; the trial justice began by taking judicial notice of the decree terminating Lopez–Navor's parental rights to Alexis, while noting that the decision was on appeal to this Court. Subsequently, he took judicial notice of Lopez–Navor's conviction for criminal neglect and the fact that she was awaiting sentencing for that offense.

Additionally, John Farley, who was Regional Director of DCYF's Family Service Unit, testified that placement of Lopez–Navor's child with family members in Mexico was not a viable option because DCYF would not be able to protect the child from Raul. Further, DCYF did consider a request to place Victoria with her maternal grandmother, but that was not feasible because she was living in a shelter.

After numerous witnesses, the trial justice issued a detailed and comprehensive written decision, dated October 19, 2005, in which he found that DCYF sustained its burden of proving by clear and convincing evidence its petition, and that Lopez–Navor's parental rights should be terminated. He recounted several relevant portions of testimony, including a portion that noted that the DCYF social caseworker described the visits between Lopez–Navor and Victoria as "appropriate," and that DCYF did not provide services for Lopez–Navor before it filed the termination petition. The trial justice also addressed the testimony of Lori Glovach (Glovach), a DCYF social caseworker supervisor, who testified that the service case plan for Victoria that was executed in September 2004 included reunification with the mother as the goal, and that among Lopez–Navor's obligations were visitation, attending parenting classes, complying with the Court's directives and with the Immigration and Naturalization Service, and cooperating with the police. The respondent complied with most of the aforementioned requirements, but she failed to attend a parenting class because there were no available services for Spanish-speaking parents. The trial justice also noted that Victoria could not be placed with her grandmother because she did not have a home that could be licensed by DCYF, as her temporary residency in the United States was a shelter. There were also concerns about placing the child with family in Mexico. He also found that, upon her discharge from the hospital, and until he was deported, respondent continued to live with Raul.

The trial justice concluded that the testimony of Maria Garrido, Ph.D. (Dr. Garrido), a clinical psychologist who counseled Lopez–Navor, was credible and candid. Doctor Garrido testified that respondent was a very young mother who bonded with her infant child and was receptive to any interventions and assistance to better her response to the child. However, Dr. Garrido testified that Lopez–Navor admitted that she was concerned about the child's safety if she returned to Mexico to the area where the family resided and would question the mother's judgment if she now was advocating for this result. The trial justice found that Lopez–Navor was not able to protect Victoria from harm.

Additionally, the trial justice found the testimony of Gilma Rojas (Rojas), the residential advocate at the Rhode Island Women's Center, who approved Lopez–Navor to watch children because she did not believe Lopez–Navor was guilty, to be without merit. Rojas testified that she

knew that Lopez–Navor had been convicted of child neglect and that her visits with Victoria were supervised by DCYF, but there was no discussion about whether it was appropriate for Lopez–Navor to care for other children.

Finally, the trial justice addressed respondent's credibility and found her to be untruthful. According to the trial justice, Lopez–Navor lied·about her fear of Raul and what he did to her son. Although she said she lied because of her fear that Raul would hurt the child, the court found that she continued to be untruthful even after the child was safely away from Raul's reach. Although he found that Lopez–Navor's progress in addressing domestic violence issues and her taking advantage of the educational opportunities offered at the shelter were commendable, the trial justice concluded that respondent still was in denial and that she considered herself a victim. The trial justice found that Lopez–Navor was not a credible witness and could not parent and protect her child from harm.

The trial justice determined that, based on all the evidence and his conclusions of law, it was proven by clear and convincing evidence that Lopez–Navor was unfit by reason of conduct and conditions of a cruel and abusive nature seriously detrimental to Alexis. Additionally, he found that Lopez–Navor created or allowed to be created a substantial risk of injury to Alexis and that it was in Victoria's best interest that respondent's parental rights be terminated. On November 1, 2005, Lopez–Navor filed a notice of appeal.

### Standard of Review

■ On appeal, "[t]his Court reviews termination of parental rights rulings by examining the record to establish whether the [Family Court] justice's findings are supported by legal and competent evi-

dence." *In re Ariel N.*, 892 A.2d 80, 83 (R.I.2006) (citing *In re Rene B.*, 544 A.2d 137, 140 (R.I.1988)). These findings are entitled to great weight, and this Court will not disturb them unless they "are clearly wrong or the trial justice overlooked or misconceived material evidence." *In re Destiny D.*, 922 A.2d 168, 172 (R.I. 2007) (citing *In re Kristen B.*, 558 A.2d 200, 204 (R.I.1989)). "Natural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." *Id.* (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Before terminating parental rights, the trial justice must find that the parent is unfit. *In re Destiny D.*, 922 A.2d at 172. The natural parent's right to due process requires that the state support its allegations by at least clear and convincing evidence. *Id.* After the trial justice determines parental unfitness, "the best interests of the child outweigh all other considerations." *Id.* at 173 (quoting *In re Kristen B.*, 558 A.2d at 203).

### Analysis

■ The respondent has presented three issues for our review. First, she alleges that the trial justice impermissibly considered evidence of conduct that occurred before Victoria was born, despite evidence of subsequent, intervening, beneficial changes in circumstances. Second, respondent contends that the trial justice abused his discretion by refusing to qualify Alison Sonko (Sonko) as an expert witness in domestic violence among immigrant women, and erred by refusing an offer of proof about Sonko's expected testimony. Third, and finally, she argues that the trial justice, when considering the best interest of the child, failed to take into account DCYF's refusal to explore the possibility of placing Victoria with her grandmother,

Epigmenia.[5]

We begin our discussion by recognizing that the trial justice was confronted with difficult and complex issues involving immigration, criminal abuse, and the potential for grave injury to Victoria, similar to what her brother Alexis had suffered at the hands of their father. The trial justice was faced with a young woman who entered the United States illegally without notice to her family and who then failed to protect her child in the face of horrific abuse and continually lied to protect the abuser. Despite her paramount parental responsibility to protect her son, this pregnant mother did nothing.

 The respondent's argument that the trial justice erred by terminating her parental rights to Victoria, solely based on the involuntary termination of her parental rights to Alexis, is unavailing. The trial justice appropriately based his decision in part on the clear and convincing evidence that Lopez–Navor allowed her other child to suffer cruel and abusive treatment and covered up for the wrongdoer. This Court consistently has declared that earlier determinations of child abuse or neglect are relevant on the issue of parental fitness. *In re Kelly S.*, 715 A.2d 1283, 1287 (R.I. 1998) (citing *In re Nicole B.*, 703 A.2d 612, 618 (R.I.1997)). Although evidence of abusive conduct toward one child must be seriously considered by the trial justice "as a factor detrimental to a parent's fitness with regard to another child and that the

threshold of evidence with regard to this other child is diminished in the face of such horrific prior actions," past abuse standing alone is "not sufficient to brand a parent unfit for life." *In re Kelly S.*, 715 A.2d at 1287. Indeed, the parent must be given every opportunity to present evidence concerning his or her parental fitness. *See id.*

 Nonetheless, this Court defers to a trial justice's finding that a respondent has not demonstrated a changed attitude or lifestyle sufficiently to be considered a fit parent, and we have declared that a parent's cruel and abusive treatment of one child, coupled with a lack of remorse or refusal to accept responsibility for the abuse, is sufficient to sustain a termination decree. *In re Jared S.*, 787 A.2d 1225, 1227 (R.I.2002).

 Furthermore, we have determined that shifting the burden of producing evidence of parental fitness is appropriate once the trial justice has determined that DCYF has made out a *prima facie* case of cruel or abusive conduct toward another child. *See In re Corryn B.*, 914 A.2d 978, 982–83 (R.I.2007). After DCYF has made out a *prima facie* case of abuse, the parent must present evidence demonstrating "that his or her past abusive conduct no longer endangers the safety of a child[;]" however, DCYF always has the burden to prove by clear and convincing evidence that the parent is unfit. *Id.* at

---

5. The respondent presented a fourth argument in her pre-briefing statement—that it was error to take judicial notice of the termination decree concerning Alexis and the guilty verdict for cruelty to or neglect of the child. However, this issue was not raised in her brief-in-chief, and we will treat this issue as waived. Notwithstanding, were this issue properly before us, we would deem it unavailing because the decision to take judicial notice of prior judgments is well supported. *See*

*In re Amber P.*, 877 A.2d 608, 616 (R.I.2005) (trial justice acted appropriately in considering a conviction despite a continuing appeal because there is a statutory duty to determine both parental fitness and what is in the best interest of the child, which may include a conviction and the facts underlying that conviction); *Silva v. Silva*, 122 R.I. 178, 184, 404 A.2d 829, 832 (1979) ("A judgment may be given res judicata effect even though that judgment is subject to an appeal.").

983 n. 3. That burden of proof abundantly was satisfied in this case.

The respondent was given every opportunity to present evidence concerning her parental fitness, and she called six witnesses. However, the trial justice referred to and rejected on credibility grounds much of the testimony of those witnesses. Additionally, he found that Lopez–Navor was unable to protect Victoria and keep her safe from Raul, and he was distressed by the evidence that Lopez–Navor returned to live with Raul after she was discharged from the hospital and Alexis had been removed from her care.

From the vantage point of his front-row seat in the courtroom, the trial justice exercised his prerogative and rejected Lopez–Navor's and Rojas's testimony. We are of the opinion that his finding that Lopez–Navor could not protect the child from Raul, despite her recent progress and efforts toward maturity, was more than justified on the record before us. The trial justice acknowledged Lopez–Navor's growth and commended her hard work, but he found that she still was in denial and considered herself a victim. He also found that she was not able to protect her child from harm. In this case, the trial justice considered the evidence before him, gave it the weight he deemed appropriate, and rendered a decision based on this evidence and the law that applied to the issues before him.

■ The respondent next contends that the trial justice abused his discretion when he refused to qualify Sonko, in accordance with Rule 702 of the Rhode Island Rules of Evidence,[6] who was "proffered by the defense as an expert in the area of

domestic violence among immigrant women," and that he erred in refusing to allow respondent to make an offer of proof. This argument is without merit.

The witness excluded from giving an expert opinion in this case was a recent law school graduate and newly admitted lawyer who acknowledged that she had an attorney-client relationship with respondent. If this was not reason enough to preclude her testimony, we are at a loss to discern just what issue of material fact her testimony would relate to. The respondent has failed to set forth the substance of Sonko's so-called expert-opinion testimony, and there is no indication on the record before us about the need for opinion evidence about domestic violence among immigrant women or why this topic was of such complexity that it was beyond the ken of this seasoned trial justice. To the extent Sonko's testimony was to explain or excuse Lopez–Navor's abject failure to protect Alexis from Raul's abuse, such opinion testimony was irrelevant and inadmissible. We are unable to glean any other purpose for this evidence.

■ It is well settled that "[t]he question of whether a witness is qualified to express an expert opinion is a matter that is committed to the sound discretion of the trial justice, and the exercise of such discretion will not be disturbed on appeal absent a showing of abuse." *Narragansett Electric Co. v. Carbone*, 898 A.2d 87, 95 (R.I.2006) (quoting *Mangasarian v. Gould*, 537 A.2d 403, 405 (R.I.1988)). Whether a witness is qualified to testify as an expert witness and the subject matter about which he or she may testify are consider-

---

6. Rule 702 of the Rhode Island Rules of Evidence—"**Testimony by experts**" provides:
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

ations within the discretion of the trial justice. *State v. Villani,* 491 A.2d 976, 978–79 (R.I.1985).

The trial justice analyzed the witness's education, employment, training, and experience and concluded that she was not qualified to render an opinion about domestic violence among immigrant women. We agree with this finding. An attorney with six months experience, five trainings in immigration law, no experience or education in social work, sociology, or psychology, and who acknowledges an attorney-client relationship with the respondent, is simply not qualified to render expert testimony on this subject.

■■■ The respondent relies on Rule 103(a)(2) of the Rhode Island Rules of Evidence[7] in her argument that the trial justice erred in refusing to allow counsel to make an offer of proof about what Sonko would have testified to had she been qualified. Although he should have allowed an offer of proof in these circumstances, we see no reversible error in the refusal to do so in the context of this case. Because the witness was not qualified to render any opinion in this case, the offer of proof is of no moment to this appeal.

The issue for our review was whether Sonko was qualified to testify as an expert, not whether her testimony was admissible had she been qualified. Moreover, we previously have held that, if the nature of the evidence offered establishes its relevance and competence or lack thereof, then no such offer of proof is necessary. *Sheeley v. Memorial Hospital,* 710 A.2d 161, 164 (R.I.1998). The trial justice had ample evidence of Sonko's purported expertise

before him, and his decision refusing to qualify her as an expert was within his discretion.

■■■ Finally, respondent contends that DCYF violated its own regulations, as well as federal and state law, when the department refused to consider placing Victoria with a member of her biological family. Unfortunately for respondent, there is no regulation or statute requiring that the child be placed with her biological family. Indeed, proceedings for the termination of parental rights " 'are held for the benefit of the child, not the parent.' " *In re Kayla N.,* 900 A.2d 1202, 1208 (R.I. 2006) (rejecting the respondents' argument based on the Americans with Disabilities Act because it did not apply in a termination-of-parental-rights proceeding). This holding applies to grandparents and other kindred. Although we have acknowledged the importance of maintaining familial ties—once the trial justice makes a finding of unfitness—the overriding consideration is the best interest of the child, which outweighs the interests of the state, the natural parent, and other family members. *In re Carlos F.,* 849 A.2d 364, 366 (R.I.2004). Furthermore, placement of a child with relatives or other suitable people relates to the best interest inquiry, not to the issue of parental fitness.

■■■ The facts in this case militated against kindred placement of Victoria. LopezNavor had no family members living in the United States until Epigmenia—who is a resident of Mexico—traveled to Rhode Island in May 2004 under a temporary visa to live with her daughter. Al-

---

7. Rule 103(a)(2) of the Rhode Island Rules of Evidence provides:

"(a) *Effect of Erroneous Ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

" * * *

"(2) *Offer of Proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

though Epigmenia was in Rhode Island at the time of Victoria's birth, she was living in a shelter and did not have a home that DCYF could license. Further, DCYF witnesses expressed their concerns to the Mexican Consulate about the mother's inability to protect her child from Raul, who lived in Mexico. The evidence in this case supported the conclusion that kindred placement of Victoria was not in her best interest. The trial justice appropriately determined that he should not alter DCYF's placement decision.

## Conclusion

For the reasons set forth in this opinion, we affirm the Family Court's judgment. The record may be remanded to the Family Court.