In re DANIEL D. et al.

No. 2009–289–Appeal.

Supreme Court of Rhode Island.

Dec. 9, 2010.

Thomas J. Corrigan Jr., Esq., Department of Children, Youth & Families, for DCYF.

Shella R. Katz, Esquire, Court Appointed Special Advocate, for CASA.

Catherine Gibran, Office of the Public Defender, for Respondent.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

The respondent, Daniel Diaz (respondent or Diaz), appeals from a Family Court decree terminating his parental rights to his three sons, Daniel, Jose, and Emmanuel. This case came before the Supreme Court for oral argument on November 9, 2010, pursuant to an order directing both parties to appear and show cause why the issues raised by this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and that the issues raised by this appeal should be decided at this time. For the reasons set forth below, we affirm the decree of the Family Court.

### I

### Facts and Travel

The respondent is the father of Daniel, Jose, and Emmanuel, currently ages fifteen, thirteen, and twelve, respectively. Diaz has been diagnosed with "mental retardation" and receives Social Security benefits for this disability.[1] He was born in Puerto Rico and speaks only Spanish.

The family first became involved with the Department of Children, Youth and Families (DCYF) in August 2002 after DCYF received a report that the children's mother was physically abusing the children and using illegal drugs. She did not know where Diaz was living at the time, but speculated that he might be living in Puerto Rico. On August 23, 2002, DCYF filed a

---

1. We wish to note that the State of Rhode Island recently has endeavored to eliminate use of the word "retarded" and like terms in an effort to address the unfortunate stigma attached to developmental disabilities. For example, in June 2010, the General Assembly passed a bill renaming the Department of Mental Health, Retardation, and Hospitals. It is now officially titled the Department of Behavioral Healthcare, Developmental Disabilities and Hospitals. G.L.1956 § 40.1–1–3.1. We do not intend any disrespect by quoting the term "mental retardation" in this opinion.

petition alleging that the children were dependent and neglected. After an *ex parte* hearing, the children were placed in DCYF custody. Approximately a year later, Diaz returned from Puerto Rico and expressed a desire for the boys to live with him there. After DCYF received a favorable report based on a home study by an agency in Puerto Rico, the three boys relocated there with their father in 2004, and the case was closed.

Diaz and his children returned to Rhode Island before February 9, 2006, on which date DCYF received a report that he was physically abusing his sons. On February 14, 2006, DCYF filed a petition in Family Court alleging that Daniel, Jose, and Emmanuel were dependent, neglected, and abused. Specifically, the petition contended that the children's mother failed to provide the boys "with a minimum degree of care, supervision or guardianship" and that Diaz "inflicted or allowed to be inflicted upon the child[ren], physical injury." A hearing was held on February 21, 2006, at which both respondent and the children's mother were present, and the children again were placed in DCYF custody.[2]

On September 28, 2007, DCYF filed three petitions in the Family Court seeking to terminate Diaz's parental rights to his three sons.[3] DCYF alleged that a ground for terminating Diaz's parental rights was that he had "abandoned or deserted" each child named in the petition. On March 13, 2008, at a pretrial hearing before the Family Court, respondent requested visitation with his children and represented that he began a parenting class that same day and was willing to undergo psychological and substance-abuse evaluations. His request was denied. A five-day trial then was held before a justice of the Family Court, commencing on October 30, 2008.

DCYF called several witnesses. First, it called Shelly Fore, a social case worker formerly employed by DCYF. Ms. Fore managed the Diaz children's case from February 2006 until September 2006. She testified that when she first was assigned to the case, the children had been removed from their father's custody after DCYF received allegations that Diaz had physically abused them and that he was "drinking to intoxication."

According to Ms. Fore, she met Diaz on February 21, 2006, at the hearing on the underlying-neglect petition. She spoke with Diaz at the courthouse through an interpreter. Ms. Fore testified that she explained to him that she could assist in reunifying him with his children, and offered him services such as substance-abuse and mental-health evaluations. Ms. Fore testified that Diaz "indicated that he was

**2.** The children were placed initially in a residential center, and were relocated to foster care a year later. On June 17, 2010, a hearing was held before a justice of the Family Court on DCYF's motion to seek placement of the children with out-of-state foster parents. In a decree entered on July 15, 2010, the Family Court found that no pre-adoptive homes could be located in Rhode Island for the children to be placed in together, despite the state's reasonable efforts to locate such a home in Rhode Island. Therefore, the Family Court determined that it was in the boys' "best interests to be placed together in the identified pre-adoptive home in the State of New York," and granted DCYF's motion. According to DCYF at oral argument before this Court, Daniel, Jose, and Emmanuel currently are living together in a pre-adoptive home in New York.

**3.** The petition also sought to terminate the parental rights of the boys' mother. However, on February 26, 2009, before the Family Court's decision in this matter was issued, she consented to the termination of her parental rights and the adoption of her children. Therefore, she is not participating in this appeal.

not in agreement to completing any evaluations and that he was in support of a case plan goal of [the children's] reunification with [their] mother." According to Ms. Fore, Diaz also "indicated that he was not interested in pursuing any further contact with the children."

Ms. Fore testified that she never had any other communication with Diaz, although she did attempt to contact him twice in June 2006 by sending letters to two of his possible addresses. According to Ms. Fore, she received no response. She testified that she later learned from the children's mother that Diaz had moved to Pennsylvania. Ms. Fore said that although she gave Diaz her business card, she never received any telephone calls or correspondence from him. Additionally, according to Ms. Fore, Diaz never visited his children during the time that she was assigned to the case.[4]

DCYF next called David Hankins, a social case worker, to testify. As of September 2006, Mr. Hankins managed the Diaz case. Mr. Hankins testified that the children's mother told him that Diaz was in Pennsylvania but that she did not know his exact location. According to Mr. Hankins, he later learned from her that Diaz may be in Woonsocket living with his sister. Mr. Hankins testified that he ascertained the apartment complex in Woonsocket where Diaz might be residing. There he located respondent's sister, Lydia, who informed Mr. Hankins of respondent's whereabouts.

On December 6, 2007, Diaz appeared at his arraignment on the petitions for termination of parental rights. Mr. Hankins testified that he spoke to Diaz at this time and that Diaz told him, with his sister

Lydia acting as an interpreter, "that he wanted to work on reunification." Mr. Hankins said that he then told Diaz that the time for reunification had passed and that a petition for termination of parental rights had been filed. Mr. Hankins testified that Diaz had not contacted him prior to that day and never had attempted to call him since Mr. Hankins had been assigned to the case.

The respondent called his two sisters, Lydia and Esther Diaz, to testify. Lydia said that Diaz lived on his own in Rhode Island, but she helped him with transportation. She testified that she also had made phone calls for him, including calls to DCYF and the Family Court, over the course of a year from 2006 until 2007. According to Lydia, she was unable to reach anyone at DCYF or the Family Court by telephone and left messages identifying herself as Diaz's sister and requesting that her call be returned. Esther testified that she helped Diaz with his finances and arranged appointments with his doctors.

Attorney Donald G.F. Elbert, Jr., the guardian *ad litem* appointed to represent Diaz, also testified for respondent. Mr. Elbert recalled that he had difficulty communicating with Diaz, but that their communication "was greatly enhanced with the interpreter." According to Mr. Elbert, Diaz "was able to communicate in Spanish and respond appropriately" through the interpreter. He testified that he slowly and repeatedly explained the proceedings to Diaz and that he "believe[d] [Diaz] understood the nature of these [termination of parental rights] proceedings."

Diaz also testified at the trial with the assistance of an interpreter.[5] He testified

4. On July 20, 2006, the underlying petition alleging that the children were dependent, neglected, and abused was dismissed concerning Diaz without prejudice due to his lack of involvement and unknown whereabouts.

5. The interpreter at times had difficulty translating Diaz's testimony because, according to

that he spoke to a woman from DCYF in February 2006 with an interpreter present and told her that he wanted to try to "get the kids back." Diaz also acknowledged that he told Ms. Fore that he would be amenable to the children's being reunified with their mother "if she had the right to go ahead and take care of them."

According to Diaz, he left Rhode Island in 2006 to live in Pennsylvania because he had difficulty finding housing in Rhode Island. He said that he lived there for a year and a half, and returned to Rhode Island in 2007. He testified that while he was in Pennsylvania he tried to contact his children through his sister, Lydia, who would make phone calls on his behalf.

DCYF called the final witness to testify, Wendy Pires, a case manager and after-care specialist for Family Resources Community Action (Family Resources) who was responsible for the cases involving the children. According to Ms. Pires, the three boys were "doing very well" in foster care. She testified that although the boys asked to see their father on occasion, Family Resources ultimately recommended that it was not in their best interests to have visitation with Diaz.

The trial justice rendered a decision on April 8, 2009, and a decree terminating respondent's parental rights to his children was entered on April 30, 2009. He found that Diaz expressed to Ms. Fore on February 21, 2006, that he "had no interest in reunification with his children." Additionally, he found that Diaz did not appear in Family Court again until December 6, 2007, for the arraignment on the petitions for termination of his parental rights. The trial justice noted that "during a significant period of this time, as much as a year and a half according to the [respondent's] testimony, the respondent father had

the interpreter, his answers were "almost

moved to Pennsylvania for financial reasons, and had no contact with his children or [DCYF]." He found that the efforts of Diaz's sister, Lydia, to contact DCYF and the Family Court "were minimal and she did not follow through in contacting [DCYF]."

As a consequence of the lack of contact that Diaz had with his children since February 21, 2006, the trial justice concluded that "DCYF established a prima facie case of abandonment by demonstrating a lack of visits or contact with said children for the statutory six month period." Therefore, he found "by clear and convincing evidence that * * * Diaz ha[d] abandoned and deserted" his three children. He also found that the children were doing well in foster care, and it was in their best interests that their father's parental rights be terminated. Accordingly, he ordered respondent's parental rights to be terminated. Diaz timely appealed.

**II**

**Standard of Review**

 This Court applies a deferential standard when reviewing a decree terminating parental rights. *In re Brooklyn M.*, 933 A.2d 1113, 1121 (R.I.2007). We "examine[ ] the record to determine whether legally competent evidence exists to support the findings of the trial justice." *In re Angelina T.*, 996 A.2d 623, 626 (R.I. 2010) (quoting *In re Natalya C.*, 946 A.2d 198, 202 (R.I.2008)). Therefore, "[t]he findings of the Family Court justice are accorded 'great weight' on appeal and will not be disturbed unless it can be shown that they 'are clearly wrong or the trial justice overlooked or misconceived material evidence.'" *In re Charles L.*, 6 A.3d 1089, 1093 (R.I.2010) (quoting *In re Jose Luis R.H.*, 968 A.2d 875, 881 (R.I.2009)).

nonverbal."

## III

### Discussion

The respondent raises two issues on appeal. First, he argues that, although DCYF made a *prima facie* showing of abandonment, this demonstration "was soundly rebutted." Second, he argues that it was not in the children's best interests "to sever ties with their father forever."

### A

### Abandonment

The procedure governing termination of parental rights is set forth in G.L.1956 § 15–7–7(a). *In re Amanda D.*, 918 A.2d 220, 224 (R.I.2007). Section 15–7–7(a)(4) provides that "[a] lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion." If the court finds by clear and convincing evidence that the parent abandoned or deserted his or her child, it "shall * * * terminate any and all legal rights of the parent to the child." Section 15–7–7(a).

■ The respondent argues that the *prima facie* case of abandonment was rebutted because "no *reasonable* efforts were * * * made to locate the father, much less to reunify him with his three sons" after Ms. Fore spoke with him after the arraignment on February 21, 2006. However, in a petition for termination of parental rights filed under § 15–7–7(a)(4), as here, DCYF "has no obligation to engage in reasonable efforts to preserve and reunify a family." Section 15–7–7(b)(1). Rather, "[o]ur cases make clear that it is primarily and ultimately the responsibility of the parent, not DCYF, 'to substantially and repeatedly maintain contact with [his or her child]' who is in the care of DCYF." *In re Serenity K.*, 891 A.2d 881, 884 (R.I. 2006) (quoting *In re Shawn B.*, 864 A.2d 621, 623 (R.I.2005)). Therefore, this claim has no merit. *See In re Cody F.*, 766 A.2d 937, 939 (R.I.2001) (rejecting the respondent-father's claim that "DCYF failed to make reasonable efforts to reunify him" with his son because DCYF has no obligation to do so "in cases where abandonment is alleged pursuant to § 15–7–7(a)(4)").

[4] The respondent next asserts that the trial justice should have afforded the conversation between him and Ms. Fore on February 21, 2006, "the weight it deserved: absolutely none whatsoever." He contends that the conversation should have been discounted because of the unknown identity and skills of the person who served as an interpreter and because "he was neither represented by counsel nor had his guardian present." Additionally, he argues that this conversation merely was "an unreliable hodgepodge of miscommunications and misunderstandings" as evidenced by his testimony that he told Ms. Fore that he wanted to "get the kids back," in contrast to Ms. Fore's testimony that he "indicated that he was not interested in pursuing any further contact with the children."

■ We emphasize that the trial justice hears the testimony "[f]rom the vantage point of his front-row seat in the courtroom." *In re Alexis L.*, 972 A.2d 159, 170 (R.I.2009) (quoting *In re Victoria L.*, 950 A.2d 1168, 1176 (R.I.2008)). For this reason, we defer to the trial justice's findings. He observed first-hand Diaz and Ms. Fore's testimony, and it was his prerogative to find her version of events more credible than Diaz's. *Id.* Indeed, Diaz's testimony was at times unresponsive, contradictory, and, according to the interpreter, "almost nonverbal."

■ Further, there is nothing in the record to support Diaz's testimony that he

told Ms. Fore that he wanted to "get the kids back." His actions, or rather his inactions, speak louder than his words. As a parent with children in DCYF care, respondent was required to "maintain substantial contact[ ] with the child[ren]" and "plan for [their] future." *In re Michael T.*, 796 A.2d 473, 474 (R.I.2002) (mem.) (citing *In re Armand*, 433 A.2d 957, 961 (R.I. 1981)). Between his court appearances on February 21, 2006, and December 6, 2007, Diaz personally did not contact his children or DCYF. During this period, he moved to Pennsylvania, and DCYF was not aware of his exact location. Although he relied on his sister, Lydia, to call DCYF on the telephone, respondent's responsibility to maintain contact with his children "was his alone to bear." *In re Serenity K.*, 891 A.2d at 885. We are mindful of Diaz's mental disability and of the language barrier between him and DCYF. However, the trial justice found "upon the believable, credible evidence * * * that [respondent] had the ability to have contact with his children and to plan for their future throughout the course of [DCYF's] involvement." We view this finding, as we must, under a deferential standard. *In re Angelina T.*, 996 A.2d at 626. After careful examination of the record, we cannot say that "the trial justice was clearly wrong or that material evidence was overlooked or misconceived" when he found by clear and convincing evidence that respondent had abandoned his children.[6] *Id.* (quoting *In re Natalya C.*, 946 A.2d at 202); *see In re Ariel N.*, 892 A.2d 80, 86, 87 (R.I.2006) (holding that the "trial justice did not err when he found that the abandonment allegation * * * had been proven by clear and convincing evidence" though the respondent had "mental health issues,"

which she argued required an examination as to whether her "lack of contact with her children was * * * voluntary").

## B

### Best Interests of the Children

■■■ Once a Family Court justice finds that the parent abandoned his or her child, "the best interests of the child outweigh all other considerations." *In re Ariel N.*, 892 A.2d at 87 (quoting *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989)). The respondent asks this Court "how could it possibly be in the boys' best interests to sever all ties with their father forever?" This question poignantly articulates the tragedy that the termination of parental rights so often occasions. *In re Alvia K.*, 909 A.2d 498, 505 (R.I.2006) (citing *In re David L.*, 877 A.2d 667, 673 (R.I.2005)). "Although this Court is ever cognizant of the significance of severing the bond between parent and child, it is in the best interests of children to have a safe and nurturing environment in which to live, learn and grow." *In re Alexis L.*, 972 A.2d at 170 (citing *In re Douglas F.*, 840 A.2d 1087, 1089 (R.I.2003) and *In re Brianna D.*, 798 A.2d 413, 415 (R.I.2002)).

Based on the "believable, credible evidence," the trial justice found "by clear and convincing evidence that it [was] in the best interest[s] of the three boys that the parental rights of their father be terminated." He concluded that the boys were "entitled to permanency" and "adoption [was] the only viable means to that end." We are satisfied that the trial justice was not clearly wrong in reaching this conclusion.

**6.** At oral argument, respondent's attorney pointed to his "first grade education" to indicate that he was "profoundly limited." While testing results and scholastic achievement are important, we note there are many other factors involved in determining the ability of the mentally disabled to function in society.

"Children should not be made to wait an indeterminate period for their parents 'to provide them with a safe and stable environment.'" *In re Alvia K.*, 909 A.2d at 505 (quoting *In re Douglas F.*, 840 A.2d at 1089 and citing *In re Eric K.*, 756 A.2d 769, 772–73 (R.I.2000)). The respondent's three boys waited for well over a year while their father lived outside of Rhode Island and did not make any direct efforts to contact them. The record shows that the children were "doing very well" in foster care. Although the boys expressed interest in seeing their father, Family Resources recommended that it was not in the boys' best interests to visit with him. Therefore, the trial justice's finding that termination was in the best interests of the children is supported by legally competent evidence, and we decline to disturb this finding on appeal.

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the decree of the Family Court terminating the parental rights of the respondent. The record may be remanded to the Family Court.