**Supreme Court**

No. 2011-385-Appeal.
(08-75-1)
(08-75-2)
(08-75-3)

In re Rita F.                          :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2011-385-Appeal.
(08-75-1)
(08-75-2)
(08-75-3)

In re Rita F.                                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Flaherty, for the Court.** This is an appeal from a Family Court decree that terminated the parental rights of Rita F.[1] (respondent) to her three children—Rita (born June 22, 2000), Theresa (born January 31, 2002), and Michael (October 29, 2004)—under G.L. 1956 § 15-7-7(a)(2)(ii) (cruel or abusive conduct), § 15-7-7(a)(2)(v) (aggravated circumstances), and § 15-7-7(a)(3) (child in Department of Children, Youth and Families (DCYF or department) custody for twelve months).[2] On appeal, the respondent argues that the trial justice committed

---

[1] The father of the children died unexpectedly about one-and-one-half years before the events at issue took place.

[2] General Laws 1956 § 15-7-7, entitled "Termination of parental rights," provides, in pertinent part:

> "(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child,

reversible error because he permitted witnesses to testify about hearsay statements made by the children. The respondent also argues that the trial justice erred when he failed to address whether DCYF had met its burden of proving that it made reasonable efforts to achieve reunification between the respondent and her children before DCYF filed a petition to terminate parental rights. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

# I
## Facts and Travel

### A
### Background

On July 22, 2008, DCYF received a phone call to its Child Abuse Hotline; it was reported that respondent's boyfriend, Ramiro Morales, had been charged with the first-degree child

---

if the court finds as a fact by clear and convincing evidence that:

"* * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

"* * *

"(ii) Conduct toward any child of a cruel or abusive nature;

"* * *

"(v) The parent has subjected the child to aggravated circumstances, which circumstances shall be abandonment, torture, chronic abuse and sexual abuse;

"* * *

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home; or

"(4) The parent has abandoned or deserted the child."

molestation of his brother's daughter when she was between the ages of four and nine.[3] At the time that DCYF received that disturbing information, Morales lived with respondent and her three children, Rita, Theresa, and Michael, who were approximately ages eight, six, and four, respectively. Concerned that respondent's children might also become victims, Jennifer Silva, a child protective investigator for DCYF, who later testified at respondent's trial for termination of parental rights, was assigned to investigate the family. Silva explained that on the same day that the Child Abuse Hotline received the phone call about Morales, she visited respondent's household. During that visit, respondent told Silva that she was aware of the allegations against Morales, but that she did not believe them and, in fact, she had posted his bail after he was arrested on the charge of first-degree child molestation of his niece. After Silva informed her that either Morales needed to leave the home or the children would be removed, she "hesitatingly agreed" that Morales would leave. Silva also explained to respondent that Morales was to have no contact with the children during the pending investigation.

The next day, respondent called DCYF to request permission that her children be allowed to visit with Morales. For approximately six days, supervised visits were allowed. However, as soon as the case against Morales' niece was "indicate[d]"—i.e., that child protective investigators concluded that, by a preponderance of the evidence, Morales' niece had been "abused or neglected," see In re Brooklyn M., 933 A.2d 1113, 1115 n.1 (R.I. 2007)—Silva informed respondent that Morales was no longer permitted to be alone with the children.

On August 8, 2008, Melissa D'Abrosca, a social caseworker for DCYF, who also testified at the subsequent trial, was assigned to the case. D'Abrosca first contacted respondent

---

[3] According to respondent's brief, on February 2, 2012, Morales plead guilty to four counts of first-degree child molestation of his niece and was sentenced to fifty-five years with thirty years to serve.

by phone on August 12, 2008, and she reiterated that Morales could not be in the home with the children and that she would be making both announced and unannounced visits to the home. During this conversation, respondent assured the caseworker that the children did not have any contact with Morales.

Between August 2008 and February 2010, D'Abrosca made at least one monthly unannounced visit to the household to determine whether Morales was on the premises and to check on the welfare of the children. During her first visit to the home, which occurred on August 18, 2008, she discovered that blankets were covering all the windows and a surveillance camera was employed to monitor the front door. The respondent explained to D'Abrosca that the blankets and camera were in place because she had obtained a restraining order against her sister. It was also during this visit that Michael made a reference to "daddy"—specifically, Michael asked, "Where did daddy go?" This was of concern to D'Abrosca, because Rita had relayed to her that Michael considered Morales to be his father, in view of the fact that his biological father had died shortly after Michael's birth. D'Abrosca testified that she again stressed to respondent that Morales was not allowed to be in the home and that if he were there, it would jeopardize the children's placement with her.

When D'Abrosca visited on September 18, 2008, nobody answered the door, even though she could hear loud music emanating from the house and she saw the family van parked in the driveway.[4] D'Abrosca then went to visit Rita and Theresa at their school—something that she did on a monthly basis. She testified that she would talk to the children individually about inappropriate touching and explained that it was her job to keep them safe. However, even

_____

[4] D'Abrosca left a note during this particular visit, which respondent responded to by telephone. D'Abrosca testified that she continued to make monthly unannounced visits, but that often no one would answer the door, even when the family van was parked in the driveway.

though D'Abrosca noted that Rita "appeared very nervous" when the topic of inappropriate touching was broached, the girls never disclosed any sexual abuse to her.

D'Abrosca was troubled by the fact that respondent was not allowing DCYF access to the home, and she was concerned that Morales was in the home. She filed a motion for a court order to restrain and enjoin respondent from allowing Morales to have any contact with the children or to allow him into the home and also to allow the department access to the home. The Family Court granted DCYF's petition and entered a no-contact order against Morales. The court also committed the children to the care, custody, and control of DCYF; however, the children remained placed in their home until they were removed by the department on February 11, 2009.

The events leading to the children's removal from the home occurred on February 10, 2009, the second time D'Abrosca gained access to the home during an unannounced visit. During this visit, Michael made a remark about how "daddy" had given him a snack, but when he was asked where "daddy" was, Michael said he did not know. D'Abrosca reiterated to respondent that Morales was not allowed in the home, and she responded that she would not jeopardize the placement of the children with her. Her visit that day caused D'Abrosca to have concerns that Morales had been in the home, so she returned the next day with her supervisor. After waiting fifteen minutes for respondent to answer the door, the two gained entry and asked respondent to let them look around the house. They discovered a bed pushed up against a closet. When asked what was in the closet, respondent became very nervous and said she was going to call her attorney. D'Abrosca then contacted the North Smithfield Police Department to conduct a search of the house; the search disclosed the presence of Morales—who was found hiding underneath the bed—a full wardrobe of his clothing, and his medications and other items.

- 5 -

Morales and respondent were immediately arrested for obstruction,[5] and a hold was placed on Michael, who was present. Rita and Theresa were picked up at their school by DCYF personnel.[6]

The children were then transported to Hasbro Children's Hospital for medical examination. The children were examined by Dr. Amy Goldberg, who later testified at trial as an expert in pediatric child abuse. When she examined Rita, Dr. Goldberg discovered that Rita's "genital examination was grossly abnormal." There was deep scarring, which was indicative of vaginal penetration. She described the scarring as "some of the deepest" she had ever seen. She also testified that the trauma that caused this type of scarring would have resulted in a "significant" and "obvious amount of blood" that would have required pressure and the holding of gauze in the area. When tested for sexually transmitted infections, the results showed that Rita had "bacterial vaginosis," which was "highly uncommon" in children who were Rita's age, and a yeast infection. Based on the scarring and untreated sexually transmitted infections, Dr. Goldberg concluded that Rita had been sexually abused, had suffered from significant and severe

_____

[5] The respondent's appellate counsel represented to this Court in her brief that Morales pleaded nolo contendere to the obstruction charge on April 7, 2009; the charge against respondent was dismissed. D'Abrosca proceeded to file a petition for termination of parental rights against respondent, alleging cruel and abusive treatment; this petition was eventually withdrawn, although a subsequent petition was filed on September 24, 2010, which forms the basis of this appeal.

[6] The children were placed in a foster home, but on February 19, 2008—after about one week— DCYF filed a motion for change of placement and the children were removed and placed in two separate foster homes—Rita and Theresa with one family and Michael with another.

In her brief, the respondent's appellate counsel also represented to this Court that during this time, respondent visited her children, until March 17, 2010, when a no-contact order was entered because a felony complaint was filed against her for three counts of criminal neglect of her children under G.L. 1956 § 11-9-5. She filed a motion to vacate the no-contact order, but it was denied. On June 11, 2012, respondent pleaded nolo contendere to all three counts under North Carolina v. Alford, 400 U.S. 25 (1970). Under the holding in Alford, 400 U.S. at 38, a court may accept a defendant's plea of guilty or nolo contendere if the court is satisfied that there is enough factual evidence to support a verdict of guilty, despite a defendant's professed belief in his or her innocence.

vaginal penetration, and had been neglected, in that no one had sought medical care for her. Significantly, however, during the visit to the hospital, neither Rita, Theresa, nor Michael made any disclosures of sexual abuse to the medical personnel who examined or treated them.

From April 2009 until February 2010, Laura Ryan, who was qualified at trial as an expert in the area of sexual abuse of children, provided therapy to the children as well as sexual-abuse evaluations. It was not until May 21, 2009—during Rita's fourth therapy session and approximately three-and-one-half months following the removal of the children from their home—that Rita disclosed the repeated sexual molestation and penetration by Morales. Rita also revealed that she had relayed the abuse to her mother on "numerous occasions" and also that the abuse had stopped in about May 2008. Shortly after Rita's disclosure, Theresa and Michael also told Ryan of various acts of sexual assault by Morales. Ryan notified the Child Abuse Hotline of the disclosures on May 26, 2009. She ultimately diagnosed the girls with post-traumatic stress disorder.

After Ryan contacted the Child Abuse Hotline about the sexual-abuse disclosures, Kelly Mainor, a child protective investigator for DCYF, increased her involvement in the case. Mainor had been assigned to the case from February 14, 2009 to January 6, 2010, but she had visited the children on only one occasion prior to the report of abuse from Ryan. Indeed, after her initial meeting, Mainor testified, her "next action was to kind of sit back and wait" to see if the children disclosed any sexual abuse. After she received notice of the disclosures to Ryan, Mainor went to interview Rita and Theresa. Each child disclosed various acts of sexual abuse that they had endured, and each revealed that respondent either was present while the abuse occurred or that

she had been told about the abuse.[7]   Based on the children's reports, Mainor indicated respondent for neglect and sexual abuse against her children.[8]   On September 24, 2010, DCYF petitioned to terminate the parental rights of respondent under §§ 15-7-7(a)(2)(ii), 15-7-7(a)(2)(v), 15-7-7(a)(3), and 15-7-7(a)(4).[9]   A trial was held in the Family Court on various dates, beginning on May 13, 2011 and concluding on July 25, 2011.

## B
## Termination of Parental Rights Proceedings

At respondent's trial for termination of parental rights, the state offered testimony of D'Abrosca, Dr. Goldberg, Silva, Mainor, Ryan, and Leanne Cuomo, a social worker for DCYF. D'Abrosca and Silva testified about the early investigation of the case, including the numerous warnings given to respondent that Morales was not to have contact with the children.   Doctor Goldberg testified to her findings as a result of her examination of Rita, and Mainor and Ryan testified about the disclosures the children made to them during the therapy sessions.   Finally, Cuomo testified that the children were currently placed with a paternal aunt and uncle in South Carolina since February 2011 and had adjusted well to that placement, which was a preadoptive home.   The respondent was also called to the stand, but she invoked her privilege against self-incrimination under the Fifth Amendment to the United States Constitution because of the

---

[7] Mainor's initial meeting with Rita and Theresa occurred on May 30, 2009.  She met with all three children in December 2009 after more information was reported to the Child Abuse Hotline from another therapist, Wendy Pires, who was working with the children.  Although Rita and Theresa disclosed further actions of abuse, Michael never made any disclosures to Mainor.

[8] According to the respondant's appellate counsel, Morales was indicted for ten counts of first-degree child molestation and six counts of second-degree child molestation as a result of the children's statements.  On February 2, 2012, he pleaded guilty to multiple counts of first-degree child molestation in this case as well as the case involving his niece, and he was sentenced to thirty years to serve with lifetime GPS monitoring.

[9] Additionally, D'Abrosca testified that there were some efforts to make a case plan, but she added that once the termination petition was filed, there was no further case planning with respondent as there were no plans for reunification.

companion criminal case against her for neglect. The respondent objected to the admission of the testimony of Mainor and Ryan about the children's statements, arguing that the statements were not admissible under the children hearsay exception of G.L.1956 § 14-1-69, because there was a lengthy passage of time between the alleged acts of abuse and the children's disclosures. However, the trial justice overruled the objections and allowed the testimony.

On August 19, 2011, the trial justice issued a bench decision, granting DCYF's petitions under §§ 15-7-7(a)(2)(ii) (cruel or abusive conduct), § 15-7-7(a)(2)(v) (aggravated circumstances), and § 15-7-7(a)(3) (child in DCYF custody for twelve months), while denying DCYF's petitions under § 15-7-7(a)(4) (abandonment). The trial justice concluded that "[t]here [wa]s not the slightest doubt in the mind of this [c]ourt that these three children * * * were both physically and sexually abused by mother's live-in boyfriend." To support his conclusion, the trial justice recounted the graphic testimony of Dr. Goldberg and Ryan, and he also summarized the testimony of D'Abrosca, Silva, and Mainor regarding the multiple warnings to respondent that Morales could not be around the children. He also noted that he drew his own inference from respondent invoking her privilege not to testify under the Fifth Amendment.

With regard to the issue of whether or not respondent was either aware of the sexual abuse or, in the exercise of due diligence, should have become aware of the sexual abuse, the trial justice concluded that, "based upon the testimony, [and] the observations of the Court, mother was well aware of what was transpiring between Mr. Morales and the children and that mother made a deliberate choice between what she desired and what was, in fact, best for the children." The trial justice explained that "[t]he record [wa]s replete with instances where the children revealed that they had informed the mother of their treatment at the hand of Mr. Morales," and he referred to various statements made by the children to Mainor and Ryan.

Specifically, the trial justice reviewed the testimony of Ryan, who testified that Rita had told her that she told respondent numerous times about the sexual abuse. He also recited various hearsay statements, including that respondent had been present when Morales spanked the children, respondent was present during one incident when Morales was naked and holding Michael in his lap, respondent called the house before she came home to inform Morales of her imminent return, and, at one point, respondent asked the children to decide whether they wanted Morales to go or to stay.

Based on these findings, the trial justice found that respondent was unfit as a parent, having "violated all the principles of motherhood." He also found that that it was "in the best interest of these children that [the] parental rights of biological mother be terminated" as she "deliberately and with due thought chose her own needs, wants, and desires over the safety and protection of her three children," and that the children were in a preadoptive home with a paternal relatives and had bonded well in that environment. A final decree terminating the parental rights of respondent was entered on August 30, 2011. The respondent timely appealed to this Court, challenging the admission of the children's hearsay statements as well as the trial justice's failure to make any findings as to whether DCYF made reasonable efforts to reunite respondent with her children.

## II
## Standard of Review

When this Court reviews the termination of parental rights, we examine the record "to establish whether the [trial] justice's findings are supported by legal and competent evidence." In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008) (quoting In re Ariel N., 892 A.2d 80, 83 (R.I. 2006)). "The findings of the Family Court justice are accorded 'great weight' on appeal and will not be disturbed unless it can be shown that they 'are clearly wrong or the trial justice

- 10 -

overlooked or misconceived material evidence.'" In re Jose Luis R.H., 968 A.2d 875, 881 (R.I. 2009) (quoting In re Victoria L., 950 A.2d at 1174). Furthermore, a "natural parent's right to due process requires that the state support its allegations by at least clear and convincing evidence." Id. (quoting In re Victoria L., 950 A.2d at 1174).

## III
## Analysis

### 1
### Hearsay Statements

During the trial, the trial justice allowed both Ryan and Mainor to testify about hearsay statements made to them by the children. The respondent argues that both the passage of time and the fact that the children had been questioned by and made statements to multiple individuals about their sexual abuse should have precluded the admission of the challenged testimony, because there was ample time for the children to reflect and deliberate, and, as a result, the children's statements were not spontaneous. Conversely, DCYF maintains that the statements made by the children to their therapists were properly admitted under the child hearsay exception set forth in § 14-1-69, because of the indicia of reliability of the statements. These indicia, argues the state, include the level of trauma endured by the children, their young ages, and the corroborating medical evidence. In a similar vein, the guardian ad litem for the children contends that the length of time before the children disclosed the sexual abuse was not unreasonable because, given the "months of being subjected to a bizarre atmosphere of abuse and concealment" created by Morales, the disclosures to Ryan were the first opportunity for the children to feel safe.[10]

---

[10] The department argues that we should look to the law of other jurisdictions that list various factors to consider in determining whether a child's delay in disclosure of sexual abuse was

- 11 -

Section 14-1-69 provides, in pertinent part:

> "**Hearsay**. — In any custody and/or termination trial * * * where a petition has been filed by the department of children, youth, and families in accordance with §§ 14-1-11, 40-11-7 and/or 15-7-7 in the family court, the court may, in its discretion, permit as evidence any statement by a child under the age of thirteen (13) years old about a prescribed act of abuse, neglect, or misconduct by a parent or guardian, if that statement was made spontaneously within a reasonable time after the act is alleged to have occurred, and if the statement was made to someone the child would normally turn to for sympathy, protection, or advice."

Indeed, we have interpreted § 14-1-69 as "liberaliz[ing] the common law test for admission of children's out-of-court statements concerning their physical abuse" by eliminating "the requirement that the declarant must have been 'laboring under the stress of nervous excitement' when the statement was made." In re Deborah M., 544 A.2d 572, 574 (R.I. 1988) (quoting State v. Creighton, 462 A.2d 980, 982 (R.I. 1983)). Despite the relaxed standards of timeliness and spontaneity under § 14-1-69, there are, nevertheless, limits to the admissibility of hearsay statements made by children in custody and termination proceedings. We have held that the passing of a few days or weeks between either a child's disclosure of abuse and the date that the alleged abuse occurred or the date when the child was removed from the scene of the abuse constitutes a reasonable time lapse for purposes of § 14-1-69. However, it is significant that the passing of several months between the acts of alleged abuse and a child's disclosure consistently has been held to be unreasonable. Compare In re Veronica T., 700 A.2d 1366, 1367 (R.I. 1997)

---

reasonable in the particular circumstances. Similarly, the guardian ad litem argues that we should adopt the reasoning and rationale used in the "fresh complaint" doctrine, as applied in other jurisdictions. See 75 C.J.S. Rape § 72 at 366-67 (2002) ("The fresh complaint doctrine permits an out-of-court complaint seasonably made by the complainant in a sexual assault case to be admitted as part of the prosecution's case-in-chief, for the purposes of corroborating the complainant's testimony and not for substantive purposes."). However, we see no need to refer to the law of other jurisdictions for guidance in deciding the issues in this case; our own jurisprudence furnishes ample assistance.

(statements made after two weeks admissible), and In re Kristen B., 558 A.2d 200, 205 (R.I. 1989) (statements made to a social worker during the first few weeks after the child victim had been placed in foster care were admissible under § 14-1-69), with In re Rocco W., 706 A.2d 1302, 1304 (R.I. 1998) (hearsay statements made approximately six months after the child was removed from the abuse were not within a reasonable time after the alleged abuse occurred), and In re Jessica C., 690 A.2d 1357, 1360, 1361 (R.I. 1997) (statements made "almost three months after" children removed from scene of alleged abuse not admissible under § 14-1-69).

It is further noteworthy that we have rejected "any approach to this issue that calls for blind obedience to the clock and an hour-by-hour count of the time that has passed between the event and the declaration"; rather, "the test to be applied is whether from the facts of a particular case the statements were spontaneous or impulsive or whether they were the product of reflection and deliberation." In re Deborah M., 544 A.2d at 574-75, 575. In determining whether a statement was made with spontaneity or at the child's first safe opportunity to disclose the alleged abuse, we have considered factors such as whether there were "significant lapses of time, ample opportunity for reflection and deliberation, and numerous previous disclosures of abuse * * *." In re Jessica C., 690 A.2d at 1361.

In this case, the children disclosed the sexual abuse approximately ten months after the alleged abuse had ceased and approximately three months after they had been removed from the scene of the abuse. Although we have declined to delineate any precise time limits for such statements to be admissible, we have never extended the hearsay exception under § 14-1-69 to more than "a few weeks." In re Kristen B., 558 A.2d at 201, 205. However, our review of the record in this case makes it clear, without question, that the children's hearsay statements were not necessary for the trial justice to determine that abuse had occurred or that a termination of

- 13 -

parental rights was appropriate.  Thus, even if the admission of the children's statements was erroneous, it does not demand reversal of the trial justice's finding that respondent knew the children were being sexually abused by Morales.[11]  Contrary to respondent's argument that the only evidence of her knowledge of the abuse was the statements by the children to Ryan and Mainor, it is our opinion that there is a plethora of independent, competent evidence in the record to support the trial justice's decision.

First, when respondent had these children in her care, she permitted them to live with an individual who she knew had been charged with first-degree child molestation of a child within the same age range as her own children.  It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being.  Further, parental knowledge that an actual offense has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded the risk.  See In re Chester J., 754 A.2d 772, 778 (R.I. 2000) (a parent who ignores or stands by while child abuse or neglect occurs is tantamount to the parent inflicting the abuse himself or herself for purposes of a termination proceeding); In re Nicole B., 703 A.2d 612, 618 (R.I. 1997) (holding that parents are held to a greater level of responsibility and awareness concerning the well-being of their children than other adults, and parents who ignore abuse are as culpable as the actors in the context of termination of parental rights); see, e.g., In re Jennifer R., 667 A.2d 535, 536 (R.I. 1995) (affirming a termination of parental rights when the trial justice found that the mother "[wa]s totally aligned with her husband [the abuser]

---

[11] The department also argues that the statements are admissible under the hearsay exception for statements made for purposes of medical diagnosis or treatment, Rule 803(4) of the Rhode Island Rules of Evidence.  However, because we conclude that there was clear and convincing legally competent evidence in the record to support the termination of parental rights without the children's statements, we decline to comment on this issue.

* * * [and] therefore, [was] unable to be supportive to her daughters [and] * * * unable to protect them").

The undisputed evidence in this record supports a determination that, despite numerous reminders and warnings from DCYF that Morales had been accused of sexually molesting his niece and that respondent needed to remove him from her home, respondent did not end the relationship. Instead, she bailed him out of jail when he was incarcerated after being accused of molesting his niece—claiming that she believed that he was falsely accused—and she moved him into her home, despite the continued warnings from DCYF and in clear violation of a court order that the children were to have no contact with him. Not only did she disregard DCYF's warnings and defy a court order, she also provided mendacious statements to DCYF about her contact with Morales: Silva and D'Abrosca testified that they had instructed her on multiple occasions that Morales was not to be in contact with the children, and each time, respondent falsely responded that he was not. Also, when asked about the surveillance camera and blankets over the windows, she responded untruthfully, telling the social worker that she had obtained a restraining order against her sister, although it was later revealed that it was Morales who had shrouded the windows with blankets and installed the security camera to avoid detection by DCYF. Indeed, the testimony by Silva and D'Abrosca support the unavoidable conclusion that respondent failed to provide proper care or protection for her children when she allowed Morales, an accused sex offender, to move into her home and when she refused to end the relationship with him, thereby subjecting her children to an unreasonable risk of physical and emotional harm. See § 15-7-7(a)(2)(ii), (v).

In addition, the graphic medical evidence presented by Dr. Goldberg reveals that Rita suffered from obvious and serious injuries that could not have escaped the watchful eye of a loving parent. Indeed, we have held that when a child suffers obvious injuries,

> "[i]t [is] reasonable for [a] trial justice to conclude on the basis of the evidence before him that a loving, caring parent would have known the source of the injuries and would have reported this information to physicians or to the police if she had not caused them herself or permitted them to happen." In re Frances, 505 A.2d 1380, 1385 (R.I. 1986).

In this case, Dr. Goldberg testified that Rita's injuries would have resulted in a copious amount of blood and significant pain. She explained that Rita had incurred "some of the deepest scarring that [she had] seen," and that this trauma would have resulted in "a significant amount of blood." In fact, Dr. Goldberg explained that Rita's injuries would have resulted in so much bleeding that they would have required pressure and the holding of gauze in the "injured area" to stanch the flow of blood. Further, even though Dr. Goldberg did not testify about her examination of Theresa or Michael, DCYF's petition to terminate respondent's parental rights as to Theresa and Michael was amply supported by clear and convincing evidence because they were also exposed to the risk of cruel and abusive conduct and the aggravated circumstance of sexual abuse. See In re Frances, 505 A.2d at 1385 (terminating parental rights with respect to all children based on cruel and abusive conduct to only one child, reasoning that "[t]he state * * * need not wait until a child's life has been permanently or irretrievably impaired before acting" quoting In re Lester, 417 A.2d 877, 881 (R.I. 1980)).

Further, during the trial on termination of parental rights, respondent invoked her privilege against self-incrimination under the Fifth Amendment. We specifically have stated that in the trial of a petition seeking the termination of parental rights, the invocation of the protection afforded under the Fifth Amendment in order to avoid testifying does not forbid the drawing of

- 16 -

adverse inferences against a party who refuses to testify. In re Rosalie H., 899 A.2d 199, 206 (R.I. 2006). Here, respondent invoked her Fifth Amendment privilege after every question, including whether she knew Morales was facing criminal charges for first-degree child molestation, whether she had bailed Morales out of jail, whether she allowed Morales to be around the children after being told by DCYF that he could not be near them, whether she faced criminal charges, whether she visited Morales at the Adult Correctional Institutions (ACI) and told him that she wanted him to come back and live with the children, and whether her children told her that Morales was sexually assaulting them. In light of all the other evidence adduced at trial, it was proper for the trial justice to draw an adverse inference when respondent refused to answer any questions whatsoever.

Moreover, the finding of cruel or abusive conduct and aggravated circumstances on the part of respondent shifted the burden of producing evidence of parental fitness to respondent to "present evidence demonstrating 'that his or her past abusive conduct no longer endangers the safety of a child.'" In re Victoria L., 950 A.2d at 1175 (quoting In re Corryn B., 914 A.2d 978, 983 n.3 (R.I. 2007)). There was no such evidence presented here.

Accordingly, after reviewing the record, we are of the opinion that, even without the children's hearsay statements, clear and convincing evidence exists to support the trial justice's findings that respondent was unfit by reason of conduct or conditions seriously detrimental to her children, in that she allowed conduct to be committed towards her children of a cruel and abusive nature, and she subjected her children to aggravated circumstances of sexual abuse. See § 15-7-7(a)(2)(ii), (v).[12]

---

[12] In view of our holding that the trial justice articulated a proper basis for termination of respondent's parental rights in accordance with § 15-7-7(a)(2)(ii) and (v), we need not and

**2**
**Reunification Efforts**

Because we agree with the trial justice that respondent's rights were properly terminated pursuant to § 15-7-7(a)(2)(ii) and (v), DCYF was under no obligation to attempt reunification of the family. Pursuant to the explicit language of § 15-7-7(b)(1), "[i]n the event that a petition is filed pursuant to subdivision[] (a)(2)(ii) [or] (a)(2)(v) * * * of this section, the department has no obligation to engage in reasonable efforts to preserve and reunify a family." The instant case falls squarely within that statutory directive. See In re Natalya C., 946 A.2d 198, 203 n.10 (R.I. 2008) ("It should be noted that [the statutory requirement that reasonable efforts to encourage and strengthen the parental relationship be made prior to filing a termination of parental rights petition] does not apply to abuse petitions filed under § 15-7-7(a)(2)(ii).").

**3**
**Best Interests of the Children**

Once a Family Court justice establishes that the state has proven a statutory justification for terminating the relationship between a biological parent and child, here § 15-7-7(a)(2)(ii) and (v), he still must establish that "the best interests of the child outweigh all other considerations." In re Dayvon G., 10 A.3d 448, 454 (R.I. 2010) (quoting In re Brook Ann R., 994 A.2d 1241, 1244 (R.I. 2010)). We are "ever cognizant of the significance of severing the bond between parent and child," but also resolutely appreciate that "it is in the best interests of children to have a safe and nurturing environment in which to live, learn and grow." In re Daniel D., 9 A.3d 651, 657 (R.I. 2010) (quoting In re Alexis L., 972 A.2d 159, 170 (R.I. 2009)).

In this case, the trial justice found that it was in the best interests of the three children to terminate the respondent's parental rights because all three children were living together with a

therefore shall not address respondent's other claim of error under § 15-7-7(a)(3). See In re Gabrielle D., 39 A.3d 655, 668 (R.I. 2012).

- 18 -

preadoptive family with which they have bonded. After carefully reviewing the record in this case, we perceive no error in the trial justice's "best interests" determination. Indeed, the fact that the respondent was willing to jeopardize the children's safety and welfare for the sake of maintaining a relationship with Morales is evidence that she is unlikely to be able to provide the proper care and custody for her children.

## Conclusion

For the foregoing reasons, the respondent-mother's appeal is denied. The decree of the Family Court terminating her parental rights is affirmed. The papers of this case may be remanded to the Family Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      In re Rita F.

**CASE NO:**      No. 2011-385-Appeal.
(08-75-1)
(08-75-2)
(08-75-3)

**COURT:**      Supreme Court

**DATE OPINION FILED:**   May 16, 2013

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice John A. Mutter

**ATTORNEYS ON APPEAL:**

For Respondent:  Catherine Gibran, Esq.
Rhode Island Public Defender

For DCYF:      Karen A. Clark, Esq.
Department of Children, Youth & Families

For CASA:      Shella R. Katz, Esq.
Court Appointed Special Advocate