OPINION
Justice Goldberg,
for the Court.
This case came before the Supreme Court on October 25, 2016, on appeal by the respondent, John S.[1] (respondent), from a decree entered in the Family Court terminating his parental rights as to his son, Malachii O. (Malachii), who was born on May 21, 2011. The parties were directed to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and examining the memo-randa filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time. For the reasons set forth in this opinion, we affirm the decree of the Family Court.
Facts and Travel
In March 2012, after a hotline received a call detailing the episode, the Department of Children, Youth, and Families (DCYF) was apprised of an alleged incident of domestic violence that occurred in Massachusetts between respondent and Malachii’s mother, which also involved Malachii. DCYF was informed that respondent at *1155 tempted to quell his ten-month-old child’s crying by pinching, slapping, and throwing the child against a wall, which the mother claimed-rendered the, child unconscious. On March 7, 2012, a petition for dependency and abuse was filed ex parte against both parents in Rhode Island, where Mala-chii resided, and respondent was charged in Massachusetts with felony crimes arising from the alleged assault. A no-contact order was issued on March 14, 2012 and entered on April 26, 2012, which prohibited respondent from having any contact with Malachii.[2] On September 27, 2013, respondent was convicted in Massachusetts by a jury of reckless endangerment of a child and assault and battery with a dangerous weapon. He was sentenced to serve three to five years in prison, followed by a two- and-one-half-year probationary term. A second no-contact order was issued in Massachusetts after respondent’s conviction. The respondent’s conviction was upheld on appeal on November 18, 2015.
On November 25, 2013, DCYF filed a petition to terminate the parental rights of respondent and Malachii’s mother.[3] As to respondent, DCYF alleged the following grounds as a basis for termination: (1) respondent was unfit due to his prolonged incarceration, which “render[ed] it improbable for [respondent] to care for [Malachii] for an extended period of time,” G.L. 1956 § 15—7—7(a)(2)(i); and (2) respondent abandoned or deserted Malachii, see § 15-7-7(a)(4).[4] Multiple summonses that were issued. for respondent were returned un-served because DCYF had difficulty locating his whereabouts in the Massachusetts prison system. The respondent was relocated in the system on multiple occasions and did not adviée DCYF of his location. He eventually was served at the Correctional Center in Shirley, Massachusetts, in May 2014, and an attorney was appointed to represent him' in the termination proceeding.[5]
The respondent declined to voluntarily relinquish his parental rights, and the case proceeded to trial on September 22 and 29, 2014. The respondent remained incarcerated in Massachusetts, and the trial was conducted telephonically to afford him the opportunity to participate. At trial, the Family Court justice heard testimony from Barbara Silvia (Silvia), the social caseworker assigned to Malachii’s case. She testified that she did not have any contact *1156 with respondent because he was incarcerated outside of Rhode Island from the inception of the case in 2012. Silvia de-tañed that she planned to prepare and discuss a case plan with respondent once he was released from prison because “he can’t put services in place with providers whhe he’s incarcerated.” She expounded that she was unaware of any programs available for parents incarcerated in Massachusetts, as DCYF does not travel to prisons in other states and she had “never case planned with any client in any other out-of-state prison.” Silvia also explained that she did not offer respondent visitation because of the no-contact orders. Although she was aware of respondent’s criminal convictions for abusing his son, she did not know when respondent would be released from prison.[6] She was informed that “upon release he could have no unsupervised contact with children under the age of [fourteen], and could not reside in the house with children under the age of [fourteen].” Due to the circumstances, including respondent’s status as a chüd abuser, Silvia testified that respondent “was not a parent that [DCYF was] looking to reunify with at the time.” The respondent acknowledged his convictions during his testimony as well,[7] citing his incarceration and the no-contact orders as justification for why he failed to provide support for his son.
Süvia testified that respondent did write two letters.[8] The first letter was sent to the Family Court on August 9, 2012, in which respondent requested a paternity test.[9] Silvia stated that she arranged for the test to be conducted; the results, which confirmed respondent’s paternity of Malachii, were received on October 17, 2013. They were forwarded by Silvia, in accordance with usual procedure, to the Family Court. The respondent made no attempt to have contact with his son while the test was pending. At trial, respondent maintained that he never received the results of the paternity test but stated that he did not contest the paternity of Mala-chii; rather, he wanted to “establish [his] rights in order to give [Malachii] a place to go, to be with [his] family.” The respondent also wrote directly to Silvia on November 11, 2013, more than a year after his first letter to the Family Court. Despite knowing about DCYF’s involvement with his son, respondent claimed that he had only recently become aware that Mala-chn was no longer living with his mother. The respondent asked that Malachn be placed with respondent’s parents, who reside in Massachusetts. Silvia testified that she met briefly with respondent’s mother and his brother, but Malachii already was residing in a preadoptive home and his mother had consented to an open adoption by the foster parents.
The Family Court justice issued a written decision on January 5, 2015, and ordered the termination of respondent’s parental rights to Malachii. The Famüy Court justice summarized the testimony of Sñvia and respondent and took judicial notice of the no-contact order issued in Rhode Island. She began by addressing *1157 respondent’s procedural arguments relating to service of process and his arraignment, rejecting both. Specifically, the Family Court justice was satisfied after reviewing the summons, hearing the testimony, as well as noting counsel’s presence at trial and his invoice for services rendered, that respondent had notice of the termination petition and was adequately represented by counsel.
Turning to the merits of the petition, the Family Court justice found that respondent had been incarcerated continuously from March 2012 for inflicting physical abuse on his child. She explicitly acknowledged that incarceration alone is not grounds for termination of parental rights; however, she concluded that, here, respondent’s incarceration was a “direct result of inflicting physical abuse on the child.” The Family Court justice found that, despite the no-contact orders, respondent did not make any attempt to seek visitation, case plan, or enroll in any services offered at the correctional facility where he was housed. These findings, coupled with the length of incarceration and the fact that respondent had not seen his son in more than two years, led the Family Court justice to conclude that respondent would be unable to care for Malachii for an extended period of time. In discussing DCYF’s reasonable efforts, the Family Court justice recognized that Silvia faced multiple hurdles due to respondent’s out-of-state incarceration and the no-contact orders, concluding that “DCYF made what reasonable efforts it could make based on the situation [respondent] put himself in.”
Alternatively, the Family Court justice found that respondent’s parental rights could be terminated on the basis that he abandoned Malachii, declaring that the un-contradicted evidence—as well as respondent’s own admission—demonstrated that respondent had had no contact with his son since March 2012. She also recognized that respondent provided no financial or emotional support for Malachii.
A decree terminating respondent’s parental rights to Malachii was entered in the Family Court on February 5, 2015. A timely appeal was filed in this Court on February 28, 2015.
Standard of Review
“On appeal, ‘[t]his Court reviews termination of parental rights rulings by examining the record to establish whether the [Family Court] justice’s findings are supported by legal and competent evidence.’ ” In re Amiah P., 54 A.3d 446, 451 (R.I. 2012) (quoting In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008)). “These findings are entitled to great weight, and this Court will not disturb them unless they ‘are clearly wrong or the [Family Court] justice overlooked or misconceived material evidence.’ ” Id. (quoting In re Victoria L., 950 A.2d at 1174).
“Natural parents have a fundamental liberty interest in the ‘care, custody, and management’ of their children.” In re Amiah P., 54 A.3d at 451 (quoting In re Destiny D., 922 A.2d 168, 172 (R.I. 2007)). “Before terminating a parent’s rights to his or her child, the [Family Court] justice must find that the parent is unfit.” Id. (citing In re Pricillion R., 971 A.2d 599, 604 (R.I. 2009)). “In these cases, the right to due process requires that the state support its allegations by clear and convincing evidence.” Id. (citing In re Jazlyn P., 31 A.3d 1273, 1279 (R.I. 2011)). “However, once the [Family Court] justice determines parental unfitness, ‘the best interests of the child outweigh all other considerations.’” Id. (quoting In re Jazlyn P., 31 A.3d at 1279).
Analysis
Before this Court, respondent presents a plethora of arguments, many of which *1158 are without merit and can be summarily addressed. The respondent claims that many of the Family Court justice’s factual findings were clearly erroneous. For instance, he points to the finding that the paternity testing was requested because respondent contested paternity; respondent professes that he requested paternity to establish his rights. It is, however, undisputed that this incarcerated parent requested a paternity test to verify the one fact that a paternity test discloses—whether he is the child’s father. The respondent also maintains that he never received these results; however, Silvia testified that she forwarded the results to the Family Court, and the record discloses that respondent wrote to Silvia less than a month later asking that the child be placed with his family. Regardless, respondent’s receipt of the results is immaterial to the Family Court justice’s findings.
Additionally, respondent claims that a certified copy of his conviction was not produced at trial. We are satisfied that this circumstance is not material because neither ground for termination required proof of conviction, and the conviction was corroborated by Silvia’s and respondent’s testimony. See §§ 15—7—7(a)(2) (i); 15-7-7(a)(4). The respondent also posits that the return of service was neither stamped nor notarized and that he was not arraigned on the petition. However, a careful review of the record reveals that respondent was never found in default; that he was represented by counsel throughout the pen-dency of the termination petition; and that he was afforded an opportunity to participate at the trial telephonically. See In re Jonathan P., 819 A.2d 198, 201 (R.I. 2003) (“[A]n incarcerated parent defending against a petition for termination of parental rights need only be afforded reasonable participation in that hearing.”). We are satisfied that these arguments are immaterial to the outcome of the case.
Of the issues meriting further analysis, respondent argues that the Family Court justice erroneously found that he was unable to care for his son for an extended period of time due to his imprisonment and, alternatively, that he abandoned Ma-lachii. Specifically, respondent claims that he was not advised about Malachii’s status and that his incarceration and the no-contact orders prevented him from providing support to the child. With respect to his incarceration as a ground for termination, respondent contends that DCYF failed to establish that it made reasonable efforts to strengthen the parental relationship between respondent and Malachii, as required by § 15-7-7(b)(l). Because we are of the opinion that the Family Court justice correctly concluded that respondent abandoned his son, we need not address § 15—7—7(a)(2)(i) as an additional basis for termination. See In re Rita F., 64 A.3d 1220, 1231 n.12 (R.I. 2013).
Abandonment
Section 15-7-7(a)(4) provides for the termination of parental rights if “[t]he parent has abandoned or deserted the child.” “A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion.” Id. “Such lack of communication does not have to be willful on the part of the parent.” In re Shanelly C., 785 A.2d 1129, 1131 (R.I. 2001) (citing In re Craig G., 765 A.2d 1200, 1202 (R.I. 2001)). The trial justice’s findings on abandonment were supported by extensive evidence in the record that respondent had no contact with Malachii for more than two years and minimal contact with DCYF concerning his son.
The respondent concedes that he did not have contact with his son for the presumptive six-month period; however, he argues that he was legally prevented from having *1159 contact or providing support. It is manifest in this record that respondent made no attempt to contact his son or to seek visitation by moving for a modification of the no-contact orders. We are not persuaded by respondent’s attempt to shift the blame in this case. The fact that respondent was incarcerated and subject to the no-contact orders is solely attributable to respondent’s physical abuse of his son. The trial justice found that respondent had had no contact with Malachii since March 2012, well beyond the six-month statutory period for presumptive abandonment. Although respondent was incarcerated and there were no-contact orders in place, these conditions are not foreign to our analysis. In In re Damien M., 819 A.2d 213 (R.I. 2003) (mem.), a father claimed that he did not have contact with his son because he feared that he would violate a no-contact order with the mother. Id. at 214. This Court nonetheless affirmed the trial justice’s finding that the father abandoned his son as the father never made an attempt to seek visitation, concluding that “the father’s actions spoke louder than his words regarding his intention to develop a relationship with his son.” Id.
Likewise, “[t]his Court repeatedly has held that incarceration is not an excuse for failure to maintain contact with one’s child for the statutory period.” In re Brook Ann R., 994 A.2d 1241, 1244 (R.I. 2010) (citing In re Serenity K., 891 A.2d 881, 884 (R.I. 2006)). “[I]t is ‘the parent, not DCYF, whose children are in the care of an authorized agency [who] is responsible to substantially and repeatedly maintain contact with the children.’ ” In re Amanda D., 918 A.2d 220, 224 (R.I. 2007) (quoting In re Shaylon J., 782 A.2d 1140, 1143 (R.I. 2001)); see also In re Serenity K., 891 A.2d at 884 (“[A] parent in this jurisdiction, incarcerated though he or she may be, ‘can abandon a child by not actively engaging in efforts to contact that child, despite having opportunities to do so.’” (quoting In re DeKarri P., 787 A.2d 1170, 1172 (R.I. 2001))). Therefore, neither respondent’s incarceration nor the no-contact orders relieved respondent of his obligation to remain in contact with his son.[10]
Furthermore, this Court “has no tolerance for a parent ‘who makes halfhearted or no attempts to visit or contact his or her child within the six-month statutory time period * * *.’ ” In re Abby D., 839 A.2d 1222, 1225 (R.I. 2004) (quoting In re DeKarri P., 787 A.2d at 1172). Here, in a two-and-one-half-year period, respondent wrote but two letters inquiring about Ma-lachii—the first of which demanded a paternity test.[11] That letter, written in Au *1160 gust 2012, reveals that respondent was aware of DCYF’s involvement—“This issue got [Malachii] taken away by DC[Y]F.” However, respondent did not contact DCYF again until November 2013, more than a year later. The record is devoid of proof that respondent made any other efforts to inquire into his son’s welfare.[12] Although respondent requested a paternity test, placement with his family, and appointment of his mother as Ma-lachii’s legal guardian, he never sought visitation, modification of the no-contact orders, or other updates, save for the paternity test. A fair reading of respondent’s letters suggests that he cared for the child; however, we have previously held that “§ 15-7-7(a)(4)[ ] does not include the element of willfulness to show abandonment.” In re Craig G., 765 A.2d at 1202. Moreover, respondent did not support Malachii in any way, either financially or emotionally. Many a birthday and Christmas passed without so much as an inquiry about his child.
We recognize that the respondent was faced with minimal options; nonetheless, we cannot ignore the fact that the respondent’s behavior toward his son has placed him in this position. As the Family Court justice explicitly acknowledged, the respondent’s “incarceration was a direct result of inflicting physical abuse on the child.” We decline to lower the threshold required to rebut the prima facie period of abandonment for this particular respondent because of the scarce options available when that situation lies squarely at his feet. DCYF has no obligation to undertake reasonable efforts to strengthen the parental bond or to reunify, when a parent is deemed unfit on the basis of abandonment. Section 15-7-7(b)(l). Accordingly, the lack of contact and communication falls squarely with the respondent. The record clearly indicates that the respondent had the addresses for both the Family Court and DCYF, and he was also represented by counsel in Massachusetts. Yet, despite additional opportunities, the respondent made but two attempts to communicate with DCYF and utterly failed to seek contact with his child. Therefore, we are satisfied that the Family Court justice properly held that the respondent abandoned Mala-chii because he had had no meaningful contact with his son since March 2012. See In re Shanelly C., 785 A.2d at 1132 (concluding that sending clothes, books, and candy was “indirect contact indicative of an unwillingness to promote and further the parent-child relationship”).
Conclusion
For these reasons, the respondent’s appeal is denied and dismissed. The decree of the Family Court terminating the parental rights of the respondent is affirmed. The papers in this case are remanded to the Family Court.

. For the sake of privacy, the family members will be referred to by only their first names.

. The order remains in full force and effect and has not been vacated or modified since it was entered.

. Malachii’s mother voluntarily consented to the termination of her parental rights.

. General Laws 1956 § 15-7-7 provides in pertinent part:
"(a) The court shall * * * terminate any and all legal rights of the parent to the child ⅜ ⅜ * if the court finds as a fact by clear and convincing evidence that:
>i* ⅝ *
"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as * * *
"(i) Institutionalization of the parent, including imprisonment, for a duration as to render it improbable for the parent to care for the child for' an extended period of time;
[[Image here]]
"(4) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion. In the event that parents of an infant have had no contact or communication with the infant for a period of six (6) months the department shall file a petition pursuant to this section and the [Fjamily [C]ourt shall conduct expedited hearings on the petition.”

.A review of the record indicates that counsel was appointed on June 18, 2014, after respondent submitted an affidavit to attest that he was indigent.

. Specifically, Silvia corresponded with a district attorney in Massachusetts regarding the status of respondent's criminal case.

. Specifically, respondent acknowledged that he was charged with abusing his child, faced trial on those charges, and was sentenced as a result of the conviction that was entered into evidence. The respondent asserted his Fifth Amendment privilege when directly asked why he was incarcerated, because his appeal was pending at the time.

. The respondent testified that he sent a third letter; however, this letter has not been produced.

. Silvia did not receive this letter until January 14, 2013.

. The dissent suggests that a no-contact order relieves the parent of his responsibility to remain in contact with the child. Imposition of no-contact orders to protect the child after a violent, parent-child attack does not toll the running of the six-month prima facie lime period for abandonment. Nor should the fact of incarceration for a violent assault upon one’s child standing alone serve as evidence to rebut the prima facie showing of abandonment. While the dissent likewise takes issue with our description of the incident as a "violent, parent-child attack," we note that respondent was convicted by a jury in Massachusetts of reckless endangerment of a child and assault and battery by means of a dangerous weapon.

.' Although the dissent appears to credit respondent's testimony that he only requested a paternity test "to establish his rights to his son so that he could place Malachii with his family[,]” this single request is insufficient evidence to rebut a prima facie showing of abandonment, especially when the child was already happily living in a preadoptive home. Cf. In re Serenity K., 891 A.2d 881, 885 (R.I. 2006) (affirming that four or five attempts to contact DCYF and arrange visits over a nineteen-month period were insufficient to rebut the prima facie showing of abandonment).

. The 2012 letter did direct that the recipient forward any questions or updates to an address in New Bedford, Massachusetts. However, this request appeared immediately after the contact information for respondent’s then-attorney and appears to relate to correspondence arising out of the paternity test, not Malachii’s welfare in general.